**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

---

JAHNELL PARKINSON,

                                        Plaintiff,                              1:22-cv-00070 (BKS/PJE)

v.

DETECTIVE MARK FLORELL, DETECTIVE CONNOR
LEE, and OFFICER SEAN SIMMONS,

                                        Defendants.

---

**Appearances:**

*Plaintiff Pro Se:*
Jahnell Parkinson
Schenectady, New York 12303

*For Defendant Florell:*
Lukas M. Horowitz
Conway, Donovan & Manley, PLLC
50 State Street, 2nd Floor
Albany, New York 12207

*For Defendants Lee and Simmons:*
Ryan P. Bailey
Bailey, Johnson & Peck, P.C.
5 Pine West Plaza, Suite 507
Washington Avenue Extension
Albany, New York 12205

**Hon. Brenda K. Sannes, Chief United States District Judge:**

**MEMORANDUM-DECISION AND ORDER**

I.      **INTRODUCTION**

Plaintiff pro se Jahnell Parkinson brought this 42 U.S.C. § 1983 action against

Defendants Mark Florell, Connor Lee, and Sean Simmons. (Dkt. No. 36). He asserts that

Defendants—all law enforcement officials—violated his Fourth Amendment rights by searching

his home and subjecting him to a visual body cavity search. Presently before the Court are

Defendants' motions for summary judgment and Plaintiff's cross-motion for summary judgment.

(Dkt. Nos. 109, 113, 118). The motions are fully briefed. (Dkt. Nos. 109-7, 113-5, 118, 124, 125,

127, 130). For the reasons that follow, Defendants' motions are granted, and Plaintiff's motion is

denied.

## II.    FACTS[1]

During 2019, Plaintiff lived in Niskayuna, New York. (*See* Dkt. No. 109-3, at 17, 96).

Defendant Florell served as a Niskayuna Police Department detective; Defendants Lee and

Simmons worked for the Rotterdam Police Department. (Dkt. No. 109-5, ¶¶ 1, 3; Dkt. No. 113-2,

at 1; Dkt. No. 113-3, at 1). Plaintiff's Fourth Amendment claims stem from a May 23, 2019

search of his home, and a search of his person following his arrest. (Dkt. No. 36, at 2, 5; *see also*

Dkt. No. 72, at 10–15, 22).

In March of that year, Plaintiff says, two people—one named Massimo Palleschi—

burglarized his home. (Dkt. No. 109-3, at 26, 96, 110–11; Dkt. No. 36, at 2). When Plaintiff

reported the burglary to Niskayuna police, Florell and others responded "to the scene to take the

report" and interview neighbors. (Dkt. No. 36, at 4; Dkt. No. 109-3, at 97–99, 114; Dkt. No. 109-

5, ¶¶ 6–8). But after this initial investigation and further correspondence with Florell, Plaintiff

became frustrated with Florell's handling of the case. (*See* Dkt. No. 36, at 4; Dkt. No. 109-3, at

34, 114–15). Plaintiff believed that Florell and other officers "did not intend on investigating the

---

[1] The facts are drawn from the parties' exhibits submitted in connection with the motions. In light of Plaintiff's pro se status, the Court has also considered his amended complaint, summary judgment submission, and statement of material facts, (Dkt. Nos. 36, 118, 124)—all of which comply with 28 U.S.C. § 1746—"as evidence for summary judgment purposes." *Brandon v. Kinter*, 938 F.3d 21, 26 n.5 (2d Cir. 2019); *cf. Tracy v. Freshwater*, 623 F.3d 90, 101–02 (2d Cir. 2010) (discussing the special solicitude afforded pro se litigants). In assessing the cross-motions for summary judgment, the Court will "draw all reasonable inferences against the party whose motion is under consideration." *Jingrong v. Chinese Anti-Cult World All. Inc.*, 16 F.4th 47, 56 (2d Cir. 2021) (quoting *Byrne v. Rutledge*, 623 F.3d 46, 53 (2d Cir. 2010)).

crimes committed against Plaintiff," (Dkt. No. 36, at 2), because Massimo Palleschi's "cousin, Claude Palleschi, [was] a state trooper born and raised in Rotterdam," (Dkt. No. 109-3, at 96; *see also* Dkt. No. 36, at 1–4). Instead, Plaintiff alleged, Defendants "conspired" to investigate him and "his assets," intending to "arrest[] him and convict[] him on various drug charges so that they [could] eventually seize his assets." (Dkt. No. 36, at 2–3; *see also id.* at 4 (alleging that Defendants and the alleged burglars "grew up together and [were] all friends on Facebook"); Dkt. No. 109-3, at 117–19 (similar)).

On May 22, 2019, Rotterdam police sought a warrant to search Plaintiff's home following their own investigation into Plaintiff. (Dkt. No. 109-4, at 2–5). Defendant Lee submitted a warrant application containing the following information about that investigation. Police became aware of Plaintiff after a confidential informant ("CI") told them Plaintiff was "selling [crack and powder] [c]ocaine and that he usually had product for sale." (*Id.* at 3). They subsequently set up two "controlled buy[s]"—one on May 16, 2019, and the other on May 21—in which Plaintiff sold a substance to the CI that later tested positive for cocaine. (*Id.* at 3–4). Before the first buy, which took place in Schenectady, police "observed [Plaintiff] leaving his residence" in Niskayuna. (Dkt. No. 109-4, at 3, 4). The second buy took place in Rotterdam, and police "followed [Plaintiff] without stops to the" buy location. (*Id.* at 4). The application included significant details about the buys—including that the participating officers had searched the CI before and after each transaction, ensured the CI made a signed statement, and collected supporting evidence consisting of "audio, video, and photographs." (*Id.*; *see also* Dkt. No. 113-3, at 20–22 (police report containing same details)). Following those buys, officers conducted a photo array with the CI, who identified Plaintiff as the seller. (Dkt. No. 109-4, at 4; Dkt. No.

3

113-3, at 21). The application further noted that Plaintiff had been "the reporting party and caller for" previous police "reports" at the Niskayuna residence. (Dkt. No. 109-4, at 4).

A Rotterdam town justice issued the warrant on May 22, and police searched Plaintiff's residence the next day.[2] (*Id.* at 6; Dkt. No. 36, at 4; Dkt. No. 113-3, at 2). That morning, officers pulled Plaintiff over as he left his home. (Dkt. No. 109-3, at 22, 28–29; Dkt. No. 118, at 1–2). "Plaintiff did not know the nature of the stop[,] only that he was legally driving his vehicle and not committing any crimes or in the process of such." (Dkt. No. 36, at 4). Plaintiff was then "taken out of his vehicle . . . , handcuffed, searched and placed in the back of an unmarked vehicle." (*Id.*; Dkt. No. 109-3, at 23, 30). At some point while he sat in the unmarked car, Plaintiff says, Lee told him that he had "messed up" and should never have "tried to get a relative of [a] police department [employee] arrested, because the guy who broke in [Plaintiff's] house, Massimo, his cousin was a cop." (Dkt. No. 109-3, at 30, 31, 35; *see also* Dkt. No. 36, at 4). Plaintiff also testified that Lee tried convincing him to be an informant, threatened to kill Plaintiff's dog, and repeatedly stated that police had a warrant, warning that they would "destroy [Plaintiff's] house." (Dkt. No. 109-3, at 23–24, 30–32, 35–36, 135–36). Ultimately, no one showed Plaintiff the warrant. (*Id.* at 33, 35; Dkt. No. 118, at 7).

Eventually, police moved Plaintiff to Simmons's marked patrol vehicle for transportation to the Rotterdam police station. (Dkt. No. 118, at 2). Defendants have submitted video footage from the patrol vehicle's dashboard camera depicting this drive, which depicts the following.

---

[2] The warrant—directed to the Rotterdam and Niskayuna police departments, among other agencies—also conferred authority to search Plaintiff's person. (Dkt. No. 109-4, at 6). Although employed by the Niskayuna police, Florell denies participating in this warrant's execution. (*See* Dkt. No. 109-5, ¶¶ 15–16). Plaintiff disputes this and testified at his deposition that security camera footage from his home during the search reflected a person that "looked like" Florell; other parts of Plaintiff's testimony, however, contradict this statement. (*See* Dkt. No. 109-3, at 104–05; *see also id.* at 55–56, 99, 107–10, 137–39). Police later sought and received additional search warrants for Plaintiff's car and bank accounts. (*See* Dkt. No. 113-3, at 5–8, 15, 37–48).

(*See* Dkt. No. 113-2, at 6 ("Video")). The top of Plaintiff's body is visible in the backseat, sitting directly behind Simmons in the driver's seat; Plaintiff's hands are restrained behind his back. (*See id.* at 0:32–50). Officers executing the search warrant could not enter Plaintiff's home, so after several minutes into the drive, they call Simmons and request that he ask Plaintiff to give them the code to unlock the front door. (*See id.* at 06:48–58). Simmons then asks Plaintiff, "will you give them the code for the front door to get into your house?" (*Id.* at 6:59–7:03). Plaintiff immediately responds, giving Simmons the code.[3] (*Id.* at 07:04–09). Simmons avers that during the drive to the police station he "saw [Plaintiff] moving around a lot" and "heard a noise that sounded like something crinkling." (Dkt. No. 113-2, at 2). At times, the video depicts Plaintiff moving in the back seat, as well as Simmons appearing to observe that movement through the rearview mirror and in one instance turning around; crinkling noises can be heard throughout the video, but the video does not reflect whether Plaintiff caused those noises. (*See* Video at 01:22–53, 03:00–06, 10:57–11:07).

Upon arriving at the station, Plaintiff testified, Simmons removed him from the car and "placed [him] on a bench" before "strip search[ing] him." (Dkt. No. 109-3, at 43–44; *see also* Dkt. No. 36, at 5; Dkt. No. 118,at 2; Dkt. No. 124, at 2). Specifically, Simmons directed Plaintiff to "strip down," "bend over," and "lift up [his] testicles and stuff." (Dkt. No. 109-3, at 45). No one else was present. (*Id.* at 44). Plaintiff does not allege that Simmons penetrated any body cavity. At his deposition Plaintiff was unsure how long the search took, but he believed it was "quick" and took under five minutes. (*See id.* at 49). For his part, Simmons states that he did not

---

[3] Plaintiff alleged that Lee and Simmons—at the station, not in the unmarked car—had threatened to kill his dog and "caus[e] excessive damage to his home" unless Plaintiff gave them the code to unlock his apartment. (*See* Dkt. No. 36, at 5; Dkt. No. 109-3, at 24–25, 35–38; Dkt. No. 124, at 2). During the videotaped ride, when Plaintiff expresses concern that officers would shoot his dog, Simmons tells Plaintiff that he heard another officer call an animal control officer to the scene to care for the dog. (Video at 07:10–26).

perform a "cavity search"; he maintains that he only "performed a search of [Plaintiff's] person for the purpose of identifying weapons " and "took [Plaintiff] to the booking area." (Dkt. No. 127-3, ¶¶ 8–9; *see also* Dkt. No. 113-2, at 2).

Later, Simmons searched the back of his patrol vehicle. (Dkt. No. 113-2, at 2, 5). Simmons had previously ensured that the vehicle contained no contraband before Plaintiff entered. (*Id.* at 1–2, 5). But after transporting Plaintiff, Simmons "found a large plastic bag with a large number of plastic bags inside, each containing a white powder," which was "partially wedged between the two seat cushions." (*Id.* at 2). Simmons gave this evidence to the assigned detective and memorialized it in a supplemental report. (*See id.* at 2, 5).

Police seized various items from Plaintiff's home following the search, including scales and money counters. (Dkt. No. 113-3, at 24–26; *see also* Dkt. No. 36, at 5; Dkt. No. 124, at 3). Lee filed felony complaints charging Plaintiff with various state drug and other offenses. (*See* Dkt. No. 113-3, at 30–35). Plaintiff later pled guilty to third-degree criminal sale of a controlled substance and served two years' imprisonment, followed by two years' post-release supervision. (*See id.* at 2; *see also* Dkt. No. 109-3, at 65–67).

## III.    STANDARD OF REVIEW

Under Rule 56(a), summary judgment may be granted only if all the submissions taken together "show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986). The moving party bears the initial burden of demonstrating "the absence of a genuine issue of material fact." *Celotex*, 477 U.S. at 323. A fact is "material" if it "might affect the outcome of the suit under the governing law," and is genuinely in dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248; *see also Jeffreys v. City of*

*New York*, 426 F.3d 549, 553 (2d Cir. 2005) (citing *Anderson*, 477 U.S. at 248). The movant may meet this burden by showing that the nonmoving party has "fail[ed] to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322; *see also Selevan v. N.Y. Thruway Auth.*, 711 F.3d 253, 256 (2d Cir. 2013) (per curiam) (explaining that summary judgment is appropriate where the nonmoving party fails "'to come forth with evidence sufficient to permit a reasonable juror to return a verdict in [their] favor on' an essential element of a claim" (quoting *In re Omnicom Grp., Inc. Sec. Litig.*, 597 F.3d 501, 509 (2d Cir. 2010))).

If the moving party meets this burden, the nonmoving party must "set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 248, 250; *see also Celotex*, 477 U.S. at 323–24; *Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009). The nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986), and cannot "rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment," *Knight v. U.S. Fire Ins. Co.*, 804 F.2d 9, 12 (2d Cir. 1986) (citing *Quarles v. Gen. Motors Corp.*, 758 F.2d 839, 840 (2d Cir. 1985) (per curiam)). "Mere conclusory allegations or denials cannot by themselves create a genuine issue of material fact where none would otherwise exist." *Hicks v. Baines*, 593 F.3d 159, 166 (2d Cir. 2010) (alterations adopted) (quoting *Fletcher v. Atex, Inc.*, 68 F.3d 1451, 1456 (2d Cir. 1995)).

"When ruling on a summary judgment motion, the district court must construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant." *Dallas Aerospace, Inc. v. CIS Air Corp.*, 352 F.3d 775, 780 (2d Cir. 2003). When presented with cross-motions for summary judgment, courts

"evaluate each party's motion on its own merits, taking care in each instance to draw all reasonable inferences against the party whose motion is under consideration." *Jingrong*, 16 F.4th at 56 (quoting *Byrne*, 623 F.3d at 53). However, the Court will assess the facts "in the light depicted by the" dashboard camera footage. *Scott v. Harris*, 550 U.S. 372, 380–81 (2007); *see also Cameron v. City of New York*, 598 F.3d 50, 60 (2d Cir. 2010).

## IV.    DISCUSSION

Defendants seek summary judgment as to both of Plaintiff's Fourth Amendment claims, challenging the search of his residence and the search of his person. (Dkt. No. 109, at 10–13; Dkt. No. 113-5, at 9–21).

### A.    Search of Plaintiff's Residence

As an initial matter, Florell argues that "there is no credible evidence establishing that [he] was personally involved in" the search of Plaintiff's home. (Dkt. No. 109-7, at 10 (capitalization and boldface omitted)). Florell denies participating in the search and argues that no reasonable juror could infer otherwise from Plaintiff's "conflicting testimony." (*Id.* at 12; *see also* Dkt. No. 109-5, ¶¶ 15–16).

Although a defendant must have been personally involved in the alleged constitutional violation to be liable under § 1983, *see Provost v. City of Newburgh*, 262 F.3d 146, 154 (2d Cir. 2001), "[a]ssessments of credibility and choices between conflicting versions of the events are matters for the jury, not for the court on summary judgment," *Jeffreys*, 426 F.3d at 553–54 (quoting *Rule v. Brine, Inc.*, 85 F.3d 1002, 1011 (2d Cir. 1996)). True, in "rare" cases—where a "plaintiff relies almost exclusively on his own testimony, much of which is contradictory and incomplete"—courts may make "some assessment of the plaintiff's account." *Rojas v. Roman Cath. Diocese of Rochester*, 660 F.3d 98, 105 (2d Cir. 2011) (per curiam) (quoting *Jeffreys*, 426 F.3d at 554). In those "extraordinary cases," however, there must be no "plausible explanation

8

for discrepancies in [the plaintiff's] testimony," such as that an "earlier account" was merely "ambiguous, confusing, or simply incomplete." *Id.* at 106 (quoting *Jeffreys*, 426 F.3d at 555 n.2). Here, the Court need not determine whether Plaintiff's testimony is sufficiently "contradictory and incomplete" to discredit it for summary judgment purposes. *Id.* at 105. Even assuming Florell participated in the search, for the reasons discussed below, that search did not violate the Fourth Amendment.

The Fourth Amendment prohibits unreasonable searches. U.S. Const. amend. IV. "Because the home is the first among equals in the Fourth Amendment's eyes," *Alexander v. City of Syracuse*, 132 F.4th 129, 146 (2d Cir. 2025) (citation modified), officers generally must obtain a warrant to search a suspect's home, *United States v. Gori*, 230 F.3d 44, 50 (2d Cir. 2000) (citing *Maryland v. Dyson*, 527 U.S. 465, 466 (1999) (per curiam)). "Ordinarily, an arrest or search conducted pursuant to a warrant issued by a neutral magistrate is presumed reasonable because such warrants may issue only upon a showing of probable cause." *Walczyk v. Rio*, 496 F.3d 139, 155–56 (2d Cir. 2007) (citing *Franks v. Delaware*, 438 U.S. 154, 171 (1978)); *see also Fabrikant v. French*, 691 F.3d 193, 214 (2d Cir. 2012). Here, as described above, officers searched Plaintiff's home pursuant to a warrant issued by a town justice.

Plaintiff advances several arguments to overcome the presumption of reasonableness, none of which are persuasive. Plaintiff first asserts that the warrant was unsupported by probable cause, and that the town justice "rubberstamped" it. (Dkt. No. 118, at 3; Dkt. No. 124, at 1, 2). The reasonableness presumption can be "defeated" where the "warrant affidavits, on their face, fail to demonstrate probable cause." *Walczyk*, 496 F.3d at 156 (citing *United States v. Leon*, 468 U.S. 897, 923 (1984)). Probable cause to search exists where, based on the totality of circumstances, "there is a fair probability that contraband or evidence of a crime will be found in

9

a particular place." *Illinois v. Gates*, 462 U.S. 213, 238 (1983); *Ganek v. Leibowitz*, 874 F.3d 73, 82 (2d Cir. 2017). The standard does not require "hard certainties." *Walczyk*, 496 F.3d at 156 (quoting *Gates*, 462 U.S. at 231); *Figueroa v. Mazza*, 825 F.3d 89, 99 (2d Cir. 2016). Rather, it turns "on the assessment of probabilities in particular factual contexts," *Florida v. Harris*, 568 U.S. 237, 244 (2013) (quoting *Gates*, 462 U.S. at 232), requiring "only such facts as make . . . the discovery of evidence" of wrongdoing "probable," *Walczyk*, 496 F.3d at 157.

The warrant application here contained ample information to meet this standard. In that application, Lee explained: (1) that a CI known to police reported that Plaintiff sold cocaine and "usually had product for sale"; (2) that police had conducted the May 16 and May 21 controlled buys in which Plaintiff sold the CI cocaine, gathering "audio, video, and photographs" as evidence, in addition to the cocaine and signed statements from the CI; (3) that before the first buy, police observed Plaintiff leaving the Niskayuna residence, and before the second, "followed [Plaintiff] without stops" to the buy location; (4) that police had conducted a photo array after those buys in which the CI identified Plaintiff as the seller; and (5) that Plaintiff had been the reporting party for previous calls to the Niskayuna residence. (Dkt. No. 109-4, at 3–4). On these facts, a reasonable person would conclude it "probable," under the totality of circumstances, that the Niskayuna residence contained evidence of "wrongdoing"—namely, evidence that Plaintiff had sold cocaine. *Walczyk*, 496 F.3d at 157; *Gates*, 462 U.S. at 238.

Resisting this conclusion, Plaintiff asserts that the CI was not "determined to be reliable or credible pursuant to constitutional standards." (Dkt. No. 118, at 3). But the subsequent investigation—including the two controlled buys, photo array, and other accompanying evidence described above—sufficiently established the known CI's reliability and credibility. *See United States v. Wagner*, 989 F.2d 69, 72–73 (2d Cir. 1993) (explaining that "[i]nformation may be

10

sufficiently reliable . . . if it is corroborated in material respects by independent evidence"); *see also McColley v. Cnty. of Rensselaer*, 740 F.3d 817, 823 (2d Cir. 2014) (similar).

Plaintiff also argues that police lacked probable cause because the drug sales did not take place at his residence. (*See* Dkt. No. 118, at 3). Warrant applications must contain "a sufficient nexus between the criminal activities alleged and the place to be searched," but need not do so using "direct evidence." *United States v. Silva*, 146 F.4th 183, 189 (2d Cir. 2025) (alteration adopted) (quoting *United States v. Singh*, 390 F.3d 168, 182 (2d Cir. 2004)). Rather, officers may establish that nexus "based on a reasonable inference from the facts presented." *Id.* (alteration adopted) (quoting *Singh*, 390 F.3d at 182). Here, the warrant application explained that, before the first buy in Schenectady, police observed Plaintiff leaving his residence in Niskayuna. (Dkt. No. 109-4, at 3, 4). And police followed Plaintiff "without stops" to the second buy location. (*Id.* at 4). The application thus contained a "sufficient nexus" between Plaintiff's alleged crimes and the Niskayuna residence. *See Silva*, 146 F.4th at 189; *cf. United States v. Muhammad*, 520 F. App'x 31, 38 (2d Cir. 2013) ("The short time between [suspect's] transactions . . . and his arrival at . . . home provide[d] a 'reasonable inference' of a nexus between the drug purchases and his residence 'based on common sense.'" (quoting *Singh*, 390 F.3d at 182)).

Finally, although, as described above, Plaintiff alleges that the real reason Defendants searched his home stemmed from his accusing Massimo Palleschi of burglarizing his home, officers' "[s]ubjective intentions play no role in ordinary, probable-cause Fourth Amendment analysis." *Whren v. United States*, 517 U.S. 806, 813 (1996); *see also Arkansas v. Sullivan*, 532 U.S. 769, 771–72 (2001) (per curiam). Whatever their motivations, no record evidence exists to call into question the other information contained in the warrant application establishing

11

probable cause. For all these reasons, this is not a case where the warrant affidavit, on its face, failed to show probable cause. *Walczyk*, 496 F.3d at 156.

Plaintiff next argues that the warrant was "forged," (*see* Dkt. No. 124, at 1, 2; Dkt. No. 118, at 1–2; Dkt. No. 130, at 1), and that the warrant application contained false information, (*see* Dkt. No. 36, at 10). Plaintiffs may rebut the reasonableness presumption when "the issuing magistrate was . . . misled into finding probable cause by material omissions for which defendants were knowingly or recklessly responsible." *Walczyk*, 496 F.3d at 156 (citing *Franks*, 438 U.S. at 155–56). But here, Plaintiff provides only conclusory allegations of forgery and falsity. (Dkt. No. 36, at 10; Dkt. No. 118, at 1–2; Dkt. No. 124, at 1, 2). His "'conclusory statements or mere allegations' will not suffice to defeat summary judgment."[4] *Moll v. Telesector Res. Grp., Inc.*, 94 F.4th 218, 228 (2d Cir. 2024) (quoting *Davis v. New York*, 316 F.3d 93, 100 (2d Cir. 2002)).

Plaintiff's remaining arguments as to the search of his home are without merit. The Rotterdam town justice had authority to issue a warrant to search Plaintiff's Niskayuna home. (Dkt. No. 118, at 3; Dkt. No. 124, at 1). Niskayuna and Rotterdam are both within Schenectady County, and one of the underlying offenses—the second controlled buy—occurred in Rotterdam. *Cf. People v. Hickey*, 40 N.Y.2d 761, 763 (1976) ("Where the underlying offense allegedly occurred within the geographic jurisdiction of the Justice Court, a search warrant may, if necessary, be executed throughout the county or in an adjoining county."); *see also People v. Alteri*, 47 A.D.3d 1070, 1071 (3d Dep't 2008) ("[A] local court may properly issue [a search] warrant when it has geographic, but not, necessarily, trial jurisdiction . . . ."). Plaintiff also argues

---

[4] Likewise, neither do Plaintiff's conclusory allegations that the town justice had not signed the warrant at the time police searched his home suffice to defeat summary judgment. (*See* Dkt. No. 118, at 7; Dkt. No. 124, at 1). As noted above, the warrant reflects that the town justice signed it the day before the search. (*See* Dkt. No. 109-4, at 6).

that officers never showed him the warrant or the search warrant application. (Dkt. No. 118, at 3, 7; *see also* Dkt. No. 124, at 2; Dkt. No. 130, at 1). But those assertions do not change the fact that the search was reasonable in light of the warrant. *See Walczyk*, 496 F.3d at 155–56; *see also United States v. Armstrong*, 406 F. App'x 500, 501 (2d Cir. 2010) (citing *Groh v. Ramirez*, 540 U.S. 551, 562 n.5 (2004)); *United States v. Sims*, 553 F.3d 580, 584 (7th Cir. 2009).

In sum, Defendants are entitled to summary judgment on this Fourth Amendment claim because a warrant supported by probable cause authorized the search of Plaintiff's home.[5]

### B.       Visual Body Cavity Search

Plaintiff's remaining Fourth Amendment claim stems from Simmons's search of Plaintiff after they arrived at the police station. Specifically, as described above, Plaintiff alleges that Simmons directed Plaintiff to remove his clothes, bend over, and lift his testicles. (*See* Dkt. No. 109-3, at 44–45). Simmons denies conducting such a search, maintaining that he "performed a search of [Plaintiff's] person for the purpose of identifying weapons " and "took [Plaintiff] to the booking area." (Dkt. No. 127-3, ¶¶ 8–9). However, he argues, even accepting Plaintiff's version of events as true, he possessed sufficient justification for conducting the search Plaintiff describes. (*See* Dkt. No. 113-5, at 11–13).

Searches incident to arrest have long constituted an exception to the Fourth Amendment's warrant requirement. *See Riley v. California*, 573 U.S. 373, 382 (2014). The Second Circuit has explained:

> (1) a "strip search" occurs when a suspect is required to remove his clothes; (2) a "visual body cavity search" is one in which the police observe the suspect's body cavities without touching them (as by having the suspect to bend over, or squat and cough, while naked); (3) a "manual body cavity search" occurs when the police put anything into a suspect's body cavity, or take anything out.

---

[5] In light of this conclusion, the Court need not address Lee's and Simmons's arguments regarding consent and qualified immunity. (Dkt. No. 113-5, at 15–21).

*Sloley v. VanBramer*, 945 F.3d 30, 36–37 (2d Cir. 2019) (quoting *Gonzalez v. City of Schenectady*, 728 F.3d 149, 158 (2d Cir. 2013)). When police subject a suspect to a visual body cavity search "as an incident to a lawful arrest," they must possess "a specific, articulable factual basis supporting a reasonable suspicion to believe the arrestee secreted evidence inside a body cavity." *Id.* at 38 (quoting *People v. Hall*, 10 N.Y.3d 303, 311 (2008)).

Accepting Plaintiff's version of events, *Jingrong*, 16 F.4th at 56, Simmons conducted a visual body cavity search that must have been supported by reasonable suspicion that Plaintiff had secreted evidence inside a body cavity, *see Sloley*, 945 F.3d at 36, 38. Reasonable suspicion requires more than a "mere hunch," but "the level of suspicion the standard requires is considerably less than proof of wrongdoing by a preponderance of the evidence, and obviously less than is necessary for probable cause." *Id.* at 43 (quoting *Navarette v. California*, 572 U.S. 393, 397 (2014)); *see also Dancy v. McGinley*, 843 F.3d 93, 106 (2d Cir. 2016). This standard "is satisfied as long as authorities can point to specific and articulable facts which, taken together with rational inferences from those facts, provide a particularized and objective basis for suspecting legal wrongdoing." *Soukaneh v. Andrzejewski*, 112 F.4th 107, 117 (2d Cir. 2024) (citation modified); *Dancy*, 843 F.3d at 106. Courts consider the totality of circumstances, *Sloley*, 945 F.3d at 43, "based on commonsense judgments and inferences about human behavior," *Illinois v. Wardlow*, 528 U.S. 119, 125 (2000); *see also Dancy*, 843 F.3d at 106.

Here, Simmons argues that the following facts established reasonable suspicion to support of the visual body cavity search: (1) Plaintiff's "suspicious behavior during transport," (2) Simmons's discovering cocaine in the back of his patrol vehicle after transporting Plaintiff to the station, and (3) that the offense underlying Plaintiff's arrest concerned possession of

14

cocaine.[6] (*See* Dkt. No. 113-5, at 11–13). At the outset, however, the Court will not consider the

cocaine found in the patrol vehicle. According to Plaintiff, the search occurred shortly after he

arrived at the station. (*See* Dkt. No. 109-3, at 43–44). Indeed, Simmons asserts that he had no

further contact with Plaintiff after taking him for booking, and that he searched the car after that.

(*See* Dkt. No. 113-2, at 2, 5; Dkt. No. 127-3, ¶¶ 8–9). Drawing reasonable inferences in

Plaintiff's favor, it appears that any search of the patrol vehicle occurred after the alleged visual

body cavity search. Thus, the facts uncovered by that search cannot be considered in evaluating

reasonable suspicion. *See Terry v. Ohio*, 392 U.S. 1, 21–22 (1968) (requiring that courts assess

reasonable suspicion based on "the facts available to the officer at the moment of the seizure or

the search").

Nevertheless, the Court concludes that the remaining facts were sufficient to confer

"reasonable suspicion to believe the arrestee secreted evidence inside a body cavity."[7] *Sloley*,

945 F.3d at 38. Plaintiff had just been arrested for selling cocaine. And during the drive to the

station—with his hands cuffed behind his back—Simmons "saw [Plaintiff] moving around a

lot." (Dkt. No. 113-2, at 2). As described above, the video confirms that Plaintiff had been

moving, and that Simmons appeared to have observed this movement through the rearview

---

[6] Simmons notes that the warrant authorizing officers' search of Plaintiff's home also authorized them to search Plaintiff. (Dkt. No. 113-5, at 12). The warrant, however, did not authorize a visual body cavity search. (*See* Dkt. No. 109-4, at 6).

[7] Simmons also argues that any visual body cavity search was "justified by the need to prevent the concealment of contraband prior to entering a secure facility." (Dkt. No. 113-5, at 13). The Second Circuit has explained that "a blanket policy of conducting visual body cavity searches on new inmates," instituted in response to legitimate penological concerns, "is constitutional." *See Murphy v. Hughson*, 82 F.4th 177, 185 (2d Cir. 2023) (alteration adopted) (quoting *Gonzalez*, 728 F.3d at 160). Unless a plaintiff presents "'substantial evidence' of an 'exaggerated' response" to those concerns, courts generally "defer" to such policies. *Id.* (quoting *Florence v. Bd. of Chosen Freeholders of Cnty. of Burlington*, 566 U.S. 318, 330 (2012)). But "[a]bsent an actual penological justification or institutional policy," the Circuit's "prior case law on the constitutional boundaries of permissible strip searches," including *Sloley*, "continues to apply." *See id.* at 186. Here, no party has presented evidence of an institutional policy, and Simmons argues that the search was warranted by penological concerns generally without any record citations in support. (*See* Dkt. No. 113-5, at 12–13). Because the Court concludes that the visual body cavity search was in any event supported by reasonable suspicion under *Sloley*, it need not address this issue.

mirror and by turning around. These facts formed a "particularized and objective basis for suspecting" that he secreted contraband in a body cavity. *Soukaneh*, 112 F.4th at 117; *cf. Sloley*, 945 F.3d at 46 (giving examples of relevant facts in this context, including "evidence that [the arrestee] was fidgeting or moved about suspiciously"). Even accepting Plaintiff's allegation that a visual body cavity search occurred, that search was supported by sufficient reasonable suspicion, and Simmons is entitled to summary judgment on this claim, too.[8]

## V.    CONCLUSION

For these reasons, it is hereby

**ORDERED** that Defendants' motions for summary judgment (Dkt. Nos. 109, 113) are **GRANTED**; and it is further

**ORDERED** that Plaintiff's motion for summary judgment (Dkt. No. 118) is **DENIED**; and it is further

**ORDERED** that Plaintiff's remaining claims are **DISMISSED with prejudice**; and it is further

**ORDERED** that the Clerk of Court is respectfully directed to enter judgment, close this case, and serve a copy of this decision on Plaintiff in accordance with the Local Rules.

**IT IS SO ORDERED.**

Dated: <u>June 16, 2026</u>
        Syracuse, New York

Brenda K. Sannes
Chief U.S. District Judge

---

[8] The Court therefore need not address Simmons's qualified immunity argument. And having determined that—even viewing the record in the light most favorable to Plaintiff—Defendants are entitled to summary judgment, the Court denies Plaintiff's cross-motion for summary judgment. *See Jingrong*, 16 F.4th at 56.

16